**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **JOSE SANCHEZ,** | CASE NO. 18-cv-04203-YGR |
| Plaintiff, | |
| vs. | **ORDER DENYING PETITION FOR HABEAS CORPUS RELIEF** |
| **SCOTT FRAUENHEIM,** | |
| Defendant. | |

Now before the Court is petitioner Jose Sanchez's petition for a writ of habeas corpus. (Dkt. No. 1 ("Petition").) The government answered (Dkt. No. 16 ("Answer")) and petitioner filed a traverse in reply (Dkt. No. 17 ("Traverse")). This case arises out of petitioner's conviction for multiple counts of both lewd or lascivious conduct and aggravated sexual assault against two of his minor daughters, plus one count of forcible penetration. Notably, the jury also deadlocked on two counts of aggravated sexual assault and two counts of forcible rape.

Petitioner raises a single ground for relief, claiming that his Fourteenth Amendment rights were violated when the trial court erroneously allowed a step-daughter, Adriana Doe, to testify about three uncharged sexual offenses that she claimed petitioner had committed against her when she was a minor.[1] (*See* Petition at 11.) Based thereon, petitioner seeks a writ of habeas corpus. Having carefully considered the petition and the papers submitted, and for the reasons stated below, the Court **DENIES** the petition for such relief.

---

[1] These three incidents had been part of the original charges but were dismissed. 1 RT 7.

# I.   BACKGROUND

## A.     Procedural Background

On May 15, 2014, the Santa Clara County District Attorney filed an information in California Superior Court accusing petitioner of eighteen felonies against two minor victims. 1 CT 234-244.  Specifically, petitioner was charged with ten sex offenses against minor Valeria Doe and eight sex offenses against minor Brenda Doe.

On May 20, 2014, a jury convicted appellant of fourteen of the eighteen counts, including lewd or lascivious conduct with and aggravated assault of Valeria and Brenda.[2]  The jury also deadlocked on the four remaining counts, which the court dismissed after declaring a mistrial.[3] On September 22, 2014, the trial court sentenced petitioner to 165 years to life.  2 CT 524-526.

The same day, petitioner filed a timely notice of appeal.  2 CT 532.  On February 1, 2017,

---

[2]  The counts upon which petitioner was convicted are as follows:
- (Count 1) lewd or lascivious conduct (Pen. Code § 288, subd (a)) with Valeria between February 1, 2009 and October 30, 2011;
- (Count 2) forcible lewd or lascivious conduct (Pen. Code § 288, subd. (b)) with Valeria between February 1, 2010 and October 30, 2011;
- (Counts 3 and 4) forcible lewd or lascivious conduct (Pen. Code § 288, subd. (b)) with Valeria between February 1, 2009 and October 30, 2011;
- (Count 5) aggravated sexual assault (Pen. Code § 269), i.e. penetration (Pen. Code § 289, subd. (a)) of Valeria between February 1, 2009 and October 30, 2011;
- (Count 6) aggravated sexual assault (Pen. Code § 269), i.e. forcible rape (Pen. Code § 261, subd. (a), paras. (2) and (6)) of Valeria between February 1, 2009 and October 30, 2011;
- (Count 10) forcible penetration (Pen. Code § 289, subd. (a)) of Valeria between October 31, 2011 and December 27, 2012;
- (Count 11) lewd or lascivious conduct (Pen. Code § 288, sub (a)) with Brenda between June 1, 2011 and July 12, 2012;
- (Counts 12, 14 and 16) aggravated sexual assault (Pen. Code § 269), i.e. penetration (Pen. Code § 289, subd. (a)) of Brenda between July 13, 2012 and December 25, 2012; and
- (Counts 13, 15 and 17) forcible lewd or lascivious conduct (Pen. Code § 288, subd. (b)) with Brenda between July 13, 2012 and December 25, 2012.
  1 CT 234-244; 2 CT 441-466.

[3]  These counts included Counts 7, 8, 9, and 18 (one count of aggravated sexual assault, i.e. forcible rape of Valeria between February 1, 2009 and October 30, 2011; two counts of forcible rape of Valeria between October 31, 2011 and December 26, 2012; and one count of aggravated sexual assault, i.e. oral copulation of Brenda between July 13, 2012 and December 25, 2012).  1 CT 234-244; 2 CT 480.

United States District Court
Northern District of California

the Court of Appeal, Sixth Appellate District affirmed the judgment. (Dkt. No. 16-5, Ex. 8 ("COA Opinion").) The California Supreme Court denied the petition for review on April 12, 2017. (Dkt. No. 16-5, Ex. 10.)

Petitioner timely filed the instant habeas petition in federal court on February 13, 2018.

**B.     Factual Background**

The Court adopts as its account of the facts the summary set forth in the last reasoned opinion in this matter, the California Court of Appeal, Sixth Appellate District's unpublished decision issued on February 1, 2017. *People v. Sanchez*, No. H041494 (Cal. App. Ct., Sixth Appellate District, Feb. 1, 2017) (unpublished opinion). This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1). The Court includes the summary of Mariah Gonzales's testimony for context before that of Adriana Doe, whose testimony is the subject of this petition. Thus:

> B.     *The prosecution's case*
>
> 1.     *Mariah Gonzales*
>
> Gonzales testified she had been dating Sanchez's son, who was not living with Sanchez at the time, for about four years. She knew that her boyfriend had three half-sisters—victim 1, victim 2 and the youngest half-sister—and she would see the girls when she and her boyfriend would visit Sanchez at his home once a week or so. During those visits, Gonzales was disturbed by how Sanchez would sometimes kiss victim 1 and victim 2 on the lips. On one occasion, she and her boyfriend were at the house and Sanchez was taking a shower. Victim 2 went into the bathroom to give him a towel and Gonzales thought that was "odd."
>
> On December 27, 2012, Gonzales was at Sanchez's house and wanted to talk to the girls about deleting their Facebook account. Gonzales knew the victims would get in trouble with their parents for having one. She told victim 1 and 2 she knew they had a Facebook account and they should delete it. Victim 1 seemed nervous and started crying. Gonzales asked if she wanted her half-brother to be there, and victim 1 said she did. Gonzales went outside and got her boyfriend.
>
> They sat on the bed and victim 1 said that when Sanchez got back from a trip to Nicaragua that summer, he brought back some lotion. He had victim 1 go into his room, take her clothes off and lie on a towel. He massaged her "down there[4] with lotion, and it really hurt." Gonzales' boyfriend became upset, punched

---

[4] On cross-examination, Gonzales clarified that victim 1 said Sanchez was "massaging her vagina."

the door and ran outside. Victims 1 and 2 were both crying hysterically at his point. Gonzales asked victim 2 if this had happened to her as well, and she said it had.

After calling her parents for a ride, Gonzales took the victims back to their half-brother's mother's[5] house.

### 2. Adriana Doe

Sanchez was Adriana's step-father and he began living in the same house with her when she was 10 or 11. She said they lived in the same house for about five years, until she was 16. During that time, Sanchez touched her in a way she believed was inappropriate on more than one occasion.

The first incident she remembered was when they went to take family pictures together at a store. The photographer asked them to squeeze together more closely and Sanchez grabbed her upper thigh to pull her close, which made her uncomfortable. He did not hold on for long.

The next incident she remembered, she was perhaps 14 or 15 and was in her room after bedtime with the lights off. She was not yet asleep and her mom was in the living room. Adriana heard Sanchez come home from work and she heard her mom ask him to carry Adriana's brother to bed, as he had fallen asleep in the living room. Adriana and her brother slept in bunk beds in the same room, so Sanchez came into the room carrying her brother. He placed her brother, still asleep, on the bottom bunk next to her.[6] As he did so, he grabbed and squeezed Adriana's breast. She moved to the side, pretending to be asleep, and saw him pull his hand back and freeze for a second. He then left the room.

On another occasion when she was 15 or 16, Adriana was home watching television in the morning. Neither her brother nor her mother was home at the time. Sanchez asked her to give him a massage. He lay down on the floor and Adriana at next to him and started massaging his back. Sanchez told her, "No, let me show you, not like that." Adriana said she knew how to do it, but Sanchez insisted that she lie down so he could demonstrate.

Adriana lay down and Sanchez began massaging her back. She said, "Okay, I know how to do it. I got it." She switched positions with Sanchez and began massaging his back again. Sanchez again told her she was not doing it right and made her lie down on her stomach again. This time, Sanchez started massaging her back underneath her shirt. He massaged her back, upper shoulders, then her sides, moving from near her stomach to underneath her arms. Adriana said he came close enough to her breasts to make her uncomfortable, but did not touch them.

---

[5] Sanchez's ex-wife.

[6] Adriana said she was 10 years older than her brother.

4

Sanchez massaged her lower back, again getting close to, but not touching, her buttocks. He also massaged her legs and inside her thighs, over her clothing, coming close to her crotch, but not touching it. Adriana was "really scared" and felt that the massage was becoming sexual. At that point, the phone rang and Sanchez answered it. It was Adriana's aunt, who asked Adriana if she wanted to go shopping with her. Adriana said she did and hung up. She told Sanchez she needed to get ready to go with her aunt, and Sanchez became angry, making a fist and punching his other hand in frustration.

Adriana told her best friend what happened and later told her older brother's girlfriend, but did not tell her mother. She was afraid her mother would confront Sanchez, who was "very aggressive" and Adriana was afraid for her mother.

### 3.    *Victim 2*

Victim 2 was 15 years old at the time of trial. Victim 2 was living with Sanchez (her father) in the summer of 2012, along with her mother, her grandfather and her two sisters. She and her sisters shared one of the three bedrooms in the house.

Before Sanchez went on a trip to Nicaragua that summer, he had touched her one time over her clothing as they sat on the couch together. They were in the living room and Sanchez told victim 2 to come sit with him. He put his hand on her jeans and rubbed her vagina through her clothing.

Sanchez also would make victim 2 kiss him on the mouth all the time, such as when he came home from work. Sometimes those were "regular" kisses, but sometimes "he would put his tongue in my mouth."

The day after he returned from Nicaragua in the summer of 2012, Sanchez gave victim 2 a massage in his room. He called her into the bedroom and, when she came in, victim 2 saw that Sanchez had laid a towel on the floor by the door. Sanchez had a bag "full of different types of lotions and he asked [victim 2] to pick one out." She did not want to be in there, but was afraid to leave or to refuse him.

Sanchez told her to take off her clothes, so victim stripped to her underwear and socks. He had her lie down on her stomach and started rubbing her shoulders. He moved his hands down her sides, skipping her lower back and began massaging her legs and feet. Sanchez then told victim 2 to open her legs. She complied and he began "rubbing my inner thighs, sometimes he would like get really close to my [vagina]."

Sanchez then moved back to her legs and feet, but "[e]ventually, he tells me to pull down my underwear." Victim 2 did not want to, but Sanchez pulled them down to her ankles though she tried to keep them above her knees. He rubbed her buttocks and inner thighs, and at one point, told her to lift her waist off the floor. He cupped his hand, put it between her legs and rubbed her vagina. After being shown her testimony from the preliminary examination, victim 2

recalled that Sanchez rubbed his fingers between her outer labia. He did so for "awhile," but victim 2 jumped a little bit when she felt a sort of "pinch" inside her vagina. Sanchez kept rubbing for a short time then told her to turn over.

After she turned over, Sanchez began rubbing her shoulders and around her breasts.[7] She could not recall if Sanchez ever touched her nipples during this massage. He rubbed her stomach, and moved to her inner thighs and vagina, again putting his fingers inside her outer labia. As he rubbed her vagina, Sanchez looked at her and asked if she "was gonna [come]."[8] He rubbed her legs and feet before finally stopping and telling her to get dressed.

Victim 2 got dressed and went to the bathroom. She felt some pain inside her vagina. It did not hurt to walk but she felt "something" when she walked.

The following day, around 3:00 p.m., Sanchez tried to massage her again. Before he came home from work that day, Sanchez called victim 2 and told her to take a shower because he was going to give her another massage. Victim 2 did not want to, but she took a shower because she did not want Sanchez to yell at her or hit her[9] for not doing as she was told.

When Sanchez got home, he told victim 2 to go into his bedroom. She did, and he closed the door behind her. The same towel was on the floor and Sanchez told victim 2 to pick out a lotion again. During this massage, Sanchez rubbed victim 2's breasts directly, rather than massaging around them. He also rubbed her vagina, with his fingers penetrating her outer labia. She did not recall that he said anything to her that day, though.

Sanchez massaged her "every day for almost a week." The massages were usually the same, but twice he tried to put his mouth on her vagina. She would bend her knee in order to prevent him from doing so and accidentally kneed him in the eye or by his nose once. Victim 2 believed that Sanchez still managed to put his mouth on her vagina once maybe.

On other occasions, Sanchez would come into the bathroom while victim 2 was taking a shower, open the curtain and tell her he was going to scrub her back for her with a sponge. She did not want him to do so, but victim 2 was afraid Sanchez would yell at her or hit her if she refused him. Sanchez would also take a small piece of soap and rub her vagina while she was in the shower. Sometimes

---

[7] Victim 2 testified that Sanchez unhooked her bra earlier while she was lying on her stomach and, despite her trying to keep her arms pressed against the floor, was able to work the straps past her elbows. When she turned onto her back, he pulled her bra away completely.

[8] The trial transcript states "couple," but we presume that is a mistranscription, since the prosecutor later asks victim 2 if Sanchez said "anything else other than, 'Take off your clothes,' 'Lift your stomach' and, 'Are you going to come?'"

[9] Victim 2 was afraid of Sanchez as he "would yell at us a lot[,] . . . [and] hit us sometimes." Sanchez hit victim 2 "[a] couple of times . . . with the belt[,] . . . [or] with his hand."

she would open a drawer inside the bathroom, which would block the bathroom door from opening and keep him out. When she did so, Sanchez would yell at her since it prevented other people from using the only bathroom in the house.

### 4. Victim 1

Victim 1 was 16 years old at the time of trial. In the summer of 2012, she lived in a house along with her father (Sanchez), her mother and her sisters. She was afraid of her father before he began touching her inappropriately, because when he was angry with her or her sisters, he would hit them with his hand or a belt.

When she was 12 years old, she recalls that Sanchez touched her vagina through her clothing. He told her not to be scared, as he was "just showing me . . . what would happen when I grow up." Sanchez said he would teach her about sexuality because she was "going to start growing" now that she had turned 12.

A couple of days later, Sanchez touched her vagina through her clothing again, though he did not say anything to her at this time. This touching took place in Sanchez's room, and she described it as him placing two fingers on her vagina and moving them up and down. In each of the following incidents, Sanchez went progressively further.

The next time he touched her, victim 1 was again in his room, and Sanchez told her he "was going to take it a step further but not to be scared because he wouldn't hurt [her]." Sanchez put his hand inside her pants—but not inside her underwear—and touched her vagina.

The next incident, which occurred while victim 1 was still 12 years old, Sanchez unbuttoned victim 1's pants, put his hand inside her underwear and touched her vagina. He "moved his finger in a circular motion and asked [her] if it tickles."

After that, Sanchez touched her vagina and put his finger inside her outer labia. He rubbed for about 30 seconds, and told her that if it hurt, he would stop. Victim 1 told him it hurt and to stop.[10] He stopped after another five seconds.

The next time he touched her, Sanchez said he "was gonna put his finger more in. He was gonna put it in deeper than the last time." The time after that, Sanchez said he "gonna put his penis in, just the tip." Victim 1 was still 12 years old when he told her that.

Victim 1 was in Sanchez's bedroom and he unbuttoned and removed her jeans. He moved her underwear "to the side" and told her to lie down in the middle of the bed. Sanchez climbed on top of her and said "not to move or else it would hurt." Victim 1 moved and Sanchez got angry, telling her he would smack

---

[10] Victim 1 said that during each of the prior incidents, whether he touched her over or underneath her clothing, she told him to stop, but he always said "hold on and it wouldn't hurt."

her if she moved again. She stopped moving. Sanchez pulled his penis out of his pants and said he was "gonna slowly put the tip in." As he did so, she said it hurt and he said, "just a little bit more." Sanchez was "going back and forth a little bit." His penis was not inside her vagina, but the tip was between her labia. He stopped soon after without inserting his penis any farther.

The next incidents did not take place until after she had turned 13. Sometime before Christmas that year, victim 1 was in Sanchez's bedroom and he told her she "was old enough for him to go—to do—go more, go further." This time, he inserted his penis further in, beyond her outer labia. This lasted about 90 seconds in all. Victim 1 told him "no" and started to cry. Sanchez got angry at her for crying so he stopped and told her to leave the room.

Victim 1 could not specifically recall the next time Sanchez touched her when she was 13, but it happened "a lot," "every day or every weekend when my mom would be at work." Once she turned 14, Sanchez started having intercourse with her and that continued after she turned 15.

In September 2012, Sanchez took a vacation to Nicaragua and when he returned, he brought massage oils with him. He began giving victim 1 massages with the oils for her muscles, as she and her sister (victim 2) would work out with Sanchez at the gym. The massages took place in Sanchez's room after he got home from work about 3:30 p.m. Sanchez would massage victim 1 first and tell victim 2 she would be next and that she should take a shower so she would be clean. Sanchez would tell their youngest sister to go do her homework in the living room.

Victim 1 said that she and victim 2 were never in the room together during these massages. Sanchez would have her remove her shirt and jeans but leave her bra and underwear on. He placed a green towel on the carpet and have victim 1 lie on her back. He would massage her normally at first but when he got to her legs he "put his hand in between like my thighs."[11] He would also touch her breasts, through her bra. He would always massage her as she lay on her back, except for the final time. He had her turn onto her stomach and started rubbing her vagina. She asked what he was doing and he told her not to say anything. He rubbed her vagina for about five minutes and "put his finger in." He moved her underwear to the side and got on top of her. She tried to get up but he told her to stay down and then put his penis in her vagina. This lasted about 10 minutes.

The last time Sanchez tried to touch her sexually was around Christmas 2012. Sanchez called her into his room and told her to close and lock the door. Victim 1 asked why, but he said to do it and "he doesn't want to ask [her] twice." She got scared and did as she was told. He told her to take off her clothes, but victim 1's youngest sister kept trying to come inside the room. Sanchez got irritated and told victim 1 to get dressed and see what the girl wanted. Victim 1

---

[11] Victim 1 said that, when this happened, Sanchez would claim it was accidental.

left the room for about 10 minutes and Sanchez came out of his room angry that she was gone so long.

Victim 1 said that when she was 14 or 15 years old, Sanchez came into the bathroom three different days as she was showering. He would put soap on a scrub brush and scrub her back, but would then scrub her rear end and have her spread her legs so he could scrub her vagina as well. One time she refused to spread her legs, and Sanchez hit her so she complied after that.

Victim 1 said she was afraid of Sanchez, and he told her if she said anything, her mother would get deported. Sanchez also told her he would only be put in jail for a few months if she reported him, and when he got out, he would kill "all of us."

Victim 1 placed two pretext calls to Sanchez, recordings of which were played for the jury. In those calls, he stated on more than one occasion that he would go to jail for "a year or 6 months" if victim 2 told police he touched her sexually. He also said he would not be able to "fix [the victims'] mother's papers." Sanchez stated that when he massaged victim 2 she would "have no cover," but had her "chonies [underwear] on." Sanchez did deny touching victim 2 in a sexual manner, however. When victim 1 said "I know how we used to do it," Sanchez replied, "Don't be saying that over the phone." When she asked if what victim 2 was telling her happened was true, Sanchez responded, "Course [*sic*] it's not," but continued "you know how I play with you guys and all that. . . . And yeah, it is true, I mean, what I do when I play, I do this and that, you know, but you guys (inaudible) you know how it is, and how to keep fighting and all that."

## C.    Defense Case

### 1.    Sanchez

Sanchez testified on his own behalf. On direct examination, he denied touching Adriana, victim 1 or victim 2 with any sexual intent at any time. He recalled that the family may have gone to K-Mart to take a family photograph, but he did not remember grabbing Adriana by the leg.

Sanchez said that when he and Adriana were living in the same house, he was working full-time at Kentucky Fried Chicken. It was usually around 11:00 p.m. when he arrived home, at which point Adriana was in bed asleep. His wife would be watching television and their young son, Brian, would typically be asleep on the couch. Sanchez would then carry Brian into the room he shared with Adriana. He would place Brian in the lower bunk with Adriana, next to the wall, and would have to reach across Adriana to get him there. One time he was doing this and remembered that he "sort of stumbled" and "kind of fell over her . . . legs or feet." He never reached out and touched her breast though, accidentally or on purpose.

Sanchez said he asked Adriana on one occasion to massage his back or shoulder because it was painful to him. The massage took place in the living room

9

and Brian was in the same room watching television. He lay down on the carpet while Adriana started massaging him. Both of them were fully clothed, though Adriana was wearing her pajamas. She was not applying enough pressure though so he had her switch places with him and he demonstrated how she should press harder. They swapped positions again.

Adriana did not follow his instructions, and he told her to lie down again so he could show her how it should be done. He pressed hard on her back and lower back with his thumbs. He is not sure if they switched positions so Adriana could try again, but the phone rang and interrupted them. It was Adriana's aunt who came by to pick Adriana up to go shopping a few minutes later. Sanchez denied that he ever touched Adriana under her clothes or touched her in a sexual manner. He also denied that he became angry that Adriana's aunt interrupted his massage.

As to the massage oils he brought back from Nicaragua, he brought them for his wife who had back problems. He got the oils from his nephew's wife, who is a professional masseuse. After he returned, he used the oils while massaging his wife's back about once a week through December 2012. They also occasionally hired a masseuse to come to the house for his wife.

In November 2012, when the masseuse was at the house, victim 2 complained of shoulder pain from working out at the gym, but she did not want the woman to massage her. So on four consecutive days, Sanchez massaged her, with her consent. Both of victim 2's sisters were in the house when these massages took place and the door to the room was never closed.

Because the professional masseuse recommended taking a shower before the massage to warm the body, Sanchez told victim 2 to take a shower. He had victim 2 pick the oil she liked and had her strip to her bra and underpants. She lay on her stomach and Sanchez unhooked her bra as he massaged her back because it was in the way. He also massaged her hands, the backs of her legs and her feet, but never asked her to spread her legs or rubbed her buttocks or genitals. He never pulled down her underwear or asked her to do so and did not have her lie on her back at any time. He never touched her breasts, put a finger in her vagina, or asked her if she was "going to come." He did not threaten her or tell her not to tell anyone about something he did.

Victim 1 saw victim 2 getting massages, and she asked Sanchez to massage her too, so he agreed. He massaged her in the same way for the same four days. He never touched her buttocks, breasts or vagina and never touched her with his penis.

When asked about the victims' testimony about what occurred in the shower, Sanchez said that victim 2 resisted showering regularly and he was concerned about her hygiene. Once the place where she got her hair cut called him and said she had lice, which Sanchez believed was because she did not shower often enough. He told her to shower daily, but victim 1 told him victim 2 just turned on the water without getting in the shower.

Sanchez started going into the bathroom and, while standing outside the shower curtain, scrubbed victim 2's back and legs with a cloth "ball." Sanchez was always clothed and he left the bathroom door open when this occurred. He did not look behind the shower curtain and never touched victim 2's vagina when he scrubbed her back.

Again, victim 1 said she wanted Sanchez to wash her back, too, so Sanchez agreed to do so. He did this three or four times, in the same manner as with victim 2, reaching around the shower curtain. He never told her to spread her legs, never hit her for not doing so and never touched her vagina.

Sanchez admitted kissing victim 2 in a normal fatherly way, but denied ever putting his tongue in her mouth.

Sanchez did yell at victims 1 and 2 when necessary, and spanked them on occasion, sometimes with a belt, as punishment for such things as lying, taking money from his wife's purse and getting bad grades. Both girls were not doing their homework and were therefore not doing well in school, and they both lied often. Sanchez threatened several times to send the girls to "boot camp." He also threatened to send them to Mexico and Nicaragua and spoke about moving the entire family to Miami.

### 2. *Other family members*

Two other family members, Elizabeth Gonzales, the ex-wife of Sanchez's cousin and Norma Sanchez, his older sister, each testified for the defense. They both testified to having had regular contact with victim 1 and 2 since they were young[12] and found that both girls frequently lied. Sanchez, however, was always truthful in their experience and he was not the type of person who would molest a child.

*People v. Sanchez*, No. H041494, at *2-14 (COA Opinion at ECF 324-336).

## II. LEGAL STANDARD

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

---

[12] Norma testified she has known the two girls since they were born.

of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the United States Supreme Court which existed at the time the petitioner's state court conviction became final. *Williams (Terry)*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-406. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Further, even if a constitutional error is found, habeas relief may only be granted if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Thus, in order to obtain habeas relief, "a state prisoner must show that the state court's ruling on

1  the claim being presented in federal court was so lacking in justification that there was an error

2  well understood and comprehended in existing law beyond any possibility for fairminded

3  disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "If this standard is difficult to

4  meet, that is because it was meant to be." *Id.* at 102.

5      In applying the above standards on habeas review, this Court reviews the "last reasoned

6  decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

7  Specifically, when there is no reasoned opinion from the highest state court that considered the

8  petitioner's claims, the Court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S.

9  797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a

10  federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's

11  claims and analyze whether the last reasoned opinion of the state court unreasonably applied

12  Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669

13  n.7 (9th Cir. 2000). As noted above, the last reasoned state court decision in this case is the

14  California Appellate Court's unpublished decision issued on February 1, 2017.

15  **III.    ERRONEOUS ADMISSION OF TESTIMONY CLAIM**

16      **A.    State Appellate Court Opinion**

17      In rejecting petitioner's claim that the trial court erroneously admitted Adriana's testimony,

18  the California Court of Appeals, Sixth Appellate District, explained as follows:

19          *A.    Admission of Adriana's testimony*

20          Sanchez argues the trial court improperly admitted his stepdaughter Adriana's
        testimony regarding three instances where Sanchez touched her in ways she considered

21      sexual. The trial court allowed the testimony pursuant to Evidence Code section 1108.

22          *1.    Evidence Code section 1108 is constitutional*

23          Sanchez first argues that Evidence Code section 1108 violates constitutional due
        process principles, though he acknowledges that the California Supreme Court rejected this

24      contention in *People v. Falsetta* (1999) 21 Cal.4th 903, 907 (*Falsetta*). He therefore raises
        the point simply to preserve it for review. As we are bound by the decision in *Falsetta*, we

25      reject the argument. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

26

27

28

### 2. *No abuse of discretion in allowing Adriana to testify*

Sanchez next argues the trial court abused its discretion in permitting Adriana to testify because the evidence she proffered was more prejudicial than probative and should have been excluded under Evidence Code section 352. We disagree.

Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101 [generally prohibiting character evidence such as past conduct to prove that defendant committed the offense in question], if the evidence is not inadmissible pursuant to Section 352." Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Evidence Code section 1108 creates an exception in sex-offense cases to the prohibition in Evidence Code section 1101 against the use of character evidence to prove the defendant has a predisposition or propensity to commit the types of crime with which he is charged. (*Falsetta*, *supra*, 21 Cal.4th at p. 911.) "By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations." (*Id*. at p. 915.) Consequently, the statute permits the trier of fact to consider uncharged sexual offenses "as evidence of the defendant's disposition to commit such crimes, and for its bearing on the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense." (*Id*. at p. 912.) "With the enactment of section 1108, the Legislature 'declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the [complaining] witness.'" (*People v. Soto* (1998) 64 Cal.App.4th 966, 983.)

Indeed, "the reason for excluding evidence of prior sexual offenses in such cases is not because that evidence lacks probative value; rather, it is because 'it has too much.'" (*People v. Branch* (2001) 91 Cal.App.4th 274, 283 (*Branch*).) "By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the

offense. [Citations.] [¶] . . . [T]he probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense." (*Falsetta*, *supra*, 21 Cal.4th at pp. 916-917.)

Here, Sanchez was charged with molesting and sexually assaulting his daughters and, given that his defense was that his daughters were lying about what happened, Adriana's testimony about what Sanchez had done with her, was probative in resolving this "credibility contest." (*Falsetta*, *supra*, 21 Cal.4th at p. 911.)

Adriana testified that when she was 14 years old, Sanchez asked her to give him a massage. When she did not perform the massage to his liking, he demonstrated on her how it should be done, and she described his massage as disturbing and sexual in nature. She also described an incident where Sanchez grabbed her upper thigh during a family photo shoot, and another where he touched her breast when he laid her sleeping younger brother next to her in her bed late one evening. This testimony was probative of Sanchez's propensity to inappropriately touch young girls with whom he had a family relationship. The massage incident Adriana described was very similar to the massaging incidents which the two victims described in their testimony.

Sanchez seeks to undercut the value of Adriana's testimony, characterizing the events as "materially dissimilar" from his later conduct with victims 1 and 2, because "Adriana testified she was 14 years old, whereas [victim 1] and [victim 2] were each considerably younger—12 and 13 years old." Even if this one or two year discrepancy could reasonably be called "considerable," the fact remains that Sanchez continued molesting the victims *after* they turned 14. The victims' ages were sufficiently close to— and even overlapped with— Adriana's age when Sanchez gave her a massage and the similarity of the massage incidents described by all three girls is probative of Sanchez having a common scheme or plan.

Sanchez also argues that the incidents described by Adriana were too "remote" in time to have any probative value. Although the remoteness of a prior offense is an appropriate factor in weighing probative value against potential prejudice, there is no bright-line rule for determining when remoteness eliminates the probative value of a prior offense. (See, e.g., *Branch*, *supra*, 91 Cal.App.4th at p. 285 [30 years]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [20 years]; *People v. Soto*, *supra*, 64 Cal.App.4th at pp. 991-992 [more than 20 years]; but see *People v. Harris* (1998) 60 Cal.App.4th 727, 739 [prior crime remote—23 years—but also inflammatory, irrelevant, likely to confuse and distract the jury].) The 10-year gap involved in this case is not so remote as to deprive Adriana's testimony of probative value.

Furthermore, the remoteness of a prior incident is only one part of the calculus the trial court must use in deciding the admissibility of evidence. The "similarities between the prior and the charged offenses" have been held to

"balance out the remoteness of the prior offenses." (*Branch*, *supra*, 91 Cal.App.4th at p. 285.) The "defendant's age at the time the previous crime was committed" can also be relevant in considering the question of remoteness in that an offense committed by a minor some number of years prior to the charged offense may be given less weight if the offense had been committed by an adult, such as Sanchez. (*People v. Burns* (1987) 189 Cal.App.3d 734, 738.)

Sanchez also claims that Adriana's testimony "lack[ed] . . . specifics" especially regarding the dates the incidents supposedly took place, and his ability to defend himself against the claims he made was improperly limited. To the extent Adriana was unable to offer exactitude in describing *when* the events took place, her descriptions of *what* occurred were detailed. Any imprecision in her testimony, which was subject to cross-examination by defense counsel, would go "to [its] weight, not [its] admissibility." (*People v. Mullens* (2004) 119 Cal.App.4th 648, 660.)

Turning to the question of prejudice, it is apparent that any prejudice which may have flowed from Adriana's testimony was minimized substantially by the fact that it was much less inflammatory than the testimony of victims 1 and 2. The relative strength and provocative nature of the evidence of uncharged acts is relevant to the analysis under Evidence Code section 352. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) The conduct described by Adriana was nowhere near as overtly sexual and reprehensible as the conduct he engaged in with his own daughters, which the jury heard them describe in great detail. The risk is slight that the jury would be so outraged by Adriana's testimony that they would convict him even if they disbelieved the victims. (See, e.g., *People v. Mullens*, *supra*, 119 Cal.App.4th at p. 660 [one victim's "testimony as to the touching of her thigh was not unduly prejudicial [given] explicit testimony regarding [the defendant's] alleged multiple lewd acts involving" another victim].)

Ultimately, it is the exclusive province of the trial court to determine whether the probative value of evidence outweighs its possible prejudicial effect. (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 402.) The trial court's exercise of discretion on this issue will not be disturbed on appeal absent a clear showing of abuse. (*Ibid.*) "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.) "[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." (*Ibid.*)

Sanchez fails to carry his burden on appeal as the record demonstrates that the trial court applied the factors outlined by the *Falsetta* court. We will not second-guess its balancing of those factors.

*People v. Sanchez*, No. H041494, at *15-19 (COA Opinion at ECF 337-341).

16

**B.     Analysis**

**1.  Legal Framework**

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A state court's evidentiary ruling therefore is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).

Applicable here, the United States Supreme Court has left open the question of whether admission of propensity evidence violates due process.  *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991).  Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA.  *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming *Alberni*); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ").

Further, failure to comply with state evidentiary rules is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal*, 926 F.2d at 919.  "While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness."  *Jammal*, 926 F.2d at 919 (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), *cert. denied*, 469 U.S. 838 (1984)).

In light of the foregoing, the due process inquiry in federal habeas review is whether "the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally

unfair." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). To meet that standard, there can be no permissible inferences that the jury may draw from the evidence. *Jammal*, 926 F.2d at 920.

### 2. Evidence of the Three Uncharged Incidents

Petitioner urges the Court to grant relief by finding a constitutional violation even though he recognizes no clearly established federal law has done so and, alternatively, by finding that the jury could not have made any permissible inference from the evidence. These arguments fail for three reasons.

First, the Court is not inclined to disregard the requirement that only an unreasonable application of clearly established Supreme Court authority warrants relief. As previously explained, the Supreme Court has specifically left open the question of whether the admission of propensity evidence violates due process. *Estelle v. McGuire,* 502 U.S. 62, 75 n. 5 (1991). Here, the State of California specifically allows propensity evidence in particular cases stemming from particular uncharged conduct if proved by a preponderance of the evidence. *People v. Falsetta*, 21 Cal. 4th 903, 923-24 (1999).[13] No "clearly established Federal law, as determined by the Supreme Court of the United States," has held that the admission of such evidence is unconstitutional. 28 U.S.C. § 2254(d); *see also Mejia*, 534 F.3d at 1046 ("[Petitioner] can point to no Supreme Court precedent establishing that admission of propensity evidence, as here, to lend credibility to a sex victim's allegations, and thus indisputably relevant to the crimes charged, is unconstitutional."); *Jaiceris v. Fairman*, 290 F. Supp. 2d 1069, 1078 (N.D. Cal. 2003) (in light of *Estelle*, "it is

---

[13] Petitioner notes that his petition "focuses on the admissibility of Adriana Does' testimony under state law," and in particular, the trial court's decision to admit the testimony under California Evidence Code section 1108. (Traverse at 14.) Insofar as petitioner bases his request for habeas relief on the trial court's application of state evidentiary rules, this argument is unavailing. The Supreme Court has expressly stated that the question of whether "evidence was incorrectly admitted . . . pursuant to California law . . . is no part of a federal court's habeas review of a state conviction." *Estelle,* 502 U.S. at 67 (citations and quotations omitted). Rather, on habeas review, "a federal court is limited to deciding whether a conviction violated [federal law]." *Id*. at 67-68; *see also Jammal,* 926 F.2d at 919-20 ("We are not a state supreme court of errors; we do not review questions of state evidence law."). Moreover, California evidentiary rules permit evidence of prior sexual offenses to show a propensity to commit the charged sexual offenses, Cal. Evid. Code § 1108, as does federal law, *United States v. LeMay*, 260 F.3d 1018, 1031 (9th Cir. 2001).

impossible for petitioner to show that the state appellate court's rejection of his constitutional claim regarding admission of the evidence 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'").

Second, petitioner has failed to demonstrate that the jury could not have drawn permissible inferences from Adriana's testimony, either generally or specifically, such that he was denied a fundamentally fair trial by the admission of her testimony. *See Jammal*, 926 F.2d at 920. Courts in this circuit have routinely held that a jury in a sexual abuse of a minor case may draw permissible inferences from evidence of the criminal defendant's prior sexual offenses. *See, e.g., Jaiceris*, 290 F. Supp. 2d at 1078-79 (evidence of prior sexual offense "did tend to show intent, in the sense of absence of accident or inadvertence," and thus, there "was a permissible inference[] that the jury could draw from the evidence, so its admission did not violate due process"); *Grunau v. Hill*, No. C 10-5648 WHA PR, 2011 WL 5444263, at *4 (N.D. Cal. Nov. 9, 2011) ("[E]vidence of petitioner's prior crimes was not introduced arbitrarily but in order to show that petitioner's conduct in the instant case was 'motivated by an unnatural or abnormal sexual interest in the victim'."); *Brooks v. Clark*, No. 08CV125-JMBLM, 2008 WL 5157726, at *8 (S.D. Cal. Nov. 12, 2008) (testimony from witnesses regarding petitioner's previous sexual offenses "sp[oke] to [p]etitioner's intent and motives" and "refute[d] [p]etitioner's arguments that his subsequent touching was non-sexual or accidental"); *Anderson v. McDowell*, No. CV 17-611 JAK (SHK), 2018 WL 3100256, at *12 (C.D. Cal. May 4, 2018) (evidence of petitioner's sexual abuse of his minor son "could be considered relevant" to his molestation of other young children). Moreover, in *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008), the Ninth Circuit affirmed the district court's denial of petitioner's habeas petition, finding that "[t]he state trial court did not violate [petitioner]'s due process rights by inferring lewd intent for the prior touchings from the April 1998 incident."

More specifically, petitioner claims that the admission of Adriana's testimony was unconstitutional because the incidents she described are "materially [] dissimilar" to the incidents described by Valeria and Brenda, in three ways. (Petition at 13.) One, he argues that a "large

passage of time" lapsed between the prior and charged acts, during which there was no evidence

of misconduct. (*Id*. at 14.) Next, the three uncharged incidents occurred over the course of five

years, which is less frequent than the incidents described by the victims. (*Id*. at 15-18.) Finally,

the victims described acts that "seemed planned and overtly sexual in nature," whereas Adriana

testified about acts that "could have been mere accidents that were misinterpreted." (*Id*. at 14,

18.)[14]

The Court disagrees that Adriana's testimony was so dissimilar from the victims'

testimony that it would have no probative value. While petitioner focuses on the differences only,

more than sufficient similarities exist to satisfy constitutional concerns. Here, Adriana was

petitioner's step-daughter and lived in the same house with him from approximately ages ten

through sixteen. The charged acts involved sexual conduct directed at daughters living in

petitioner's home. Based on the girls' testimony, they were all between the ages of twelve and

sixteen when at least some of the inappropriate conduct occurred.

Moreover, the massage incident described by Adriana is substantially similar to incidents

described by Valeria and Brenda. The location and manner in which he touched her (by her

crotch, on her breasts, mounting) indicated a willingness to touch a minor who was powerless to

oppose.[15] From this testimony, the jury could have drawn a permissible inference that petitioner

had a particular *modus operandi* of touching the girls while giving "massages," and thus, contrary

to petitioner's argument at trial, Valeria and Brenda were not lying about the charged conduct, but

---

[14] Petitioner's attempt to liken this case to *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000) fails to persuade. (Petition at 17.) In *Glanzer*, the Ninth Circuit affirmed a district court's decision to exclude evidence of appellant's alleged prior misconduct, finding that the court properly applied the Federal Rules of Evidence and explained why it was excluding relevant evidence. *Id*. at 1267-1270. *Glanzer*, however, did not involve a federal habeas petition brought by a state prisoner. Moreover, even if *Glanzer* applied, the state appellate court in this case issued a reasoned opinion that considered many of the *Glanzer* factors and properly concluded that the probative value of Adriana's testimony outweighed any prejudicial effect.

[15] Had the sole incident been the photo booth touching, the analysis may have been different. The probative value of that incident alone is not great. Rather, unless she was lying, the incident, while minor, reveals that it had such an impact on Adriana that she remembered it years later and it corroborated the testimony that petitioner's actions grew more significant over time.

rather, petitioner was not credible when he testified that he did not intend to touch the victims inappropriately.[16]

Although about ten years separate the prior bad acts and the earliest charged act (*id.* at 14-15), there is no bright line rule for determining whether a prior crime is too remote to be admissible, and acts that are remote in time may nevertheless be "extremely probative and relevant" where, as here, they are sufficiently similar to the charged acts. *United States v. Spillone,* 879 F.2d 514, 519 (9th Cir. 1989).[17] To the extent the incidents described by Adriana and those described by the victims are dissimilar because of the frequency or sexual nature of the incidents, such differences are obvious, and the jury could properly weigh the relative significance in considering the evidence. Thus, because there were permissible inferences that could be drawn from Adriana's testimony, admission of this evidence did not render petitioner's trial "fundamentally unfair." *Jammal*, 926 F.2d at 920.

Third, even if the trial court erroneously admitted Adriana's testimony, the error did not rise to the level of creating a "substantial and injurious effect" on the verdict such that habeas relief is warranted. *Plascencia v. Alameida,* 467 F.3d 1190, 1203 (9th Cir. 2006) (quoting *Brecht,* 507 U.S. at 623). Although petitioner contends that Adriana's testimony was "inflammatory" and "inappropriately suggestive" (Traverse at 16), her testimony was far less

---

[16] The trial court's use of a limiting instruction that the jurors should consider Adriana's testimony only to determine petitioner's credibility (1 Aug. RT 26-27), also protected against any potential unfairness. *See Terrovona v. Kincheloe*, 912 F.2d 1176, 1180-81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury cautionary instruction); *Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir. 1990) (admission of uncharged crimes did not violate due process where trial court gave limiting instruction to jury, jury was able to weigh witness' credibility, and evidence was relevant to defendant's intent); *Grunau v. Hill*, No. C 10-5648 WHA PR, 2011 WL 5444263, at *5 (N.D. Cal. Nov. 9, 2011) (in habeas case, finding that "[l]imiting instructions are one way that defendants' interests are protected in the face of otherwise-prejudicial evidence").

[17] Petitioner contends that Adriana's testimony was "unsubstantiated" and denies that the incidents she describes took place. (Traverse at 14, 16.) Petitioner's denial does not negate the testimony. The nature of such incidents lend themselves to two-party encounters. A jury is commonly suited with weighing the credibility of a single witness's testimony and does not itself warrant a finding by the state courts that the probative value of the testimony was outweighed by any prejudicial effect.

provocative than the victims' own accounts of sexual abuse. Indeed, both victims testified in detail about petitioner molesting them repeatedly over the course of multiple years, and the petitioner's son's girlfriend corroborated the victims' testimony. The defense offered evidence that the victims had a history of lying. This evidence, in effect, countered that challenged.

Ultimately, the jury appeared to have weighed each witness's testimony in the manner they deemed appropriate, advising the Court that they had deadlocked on four of the counts and indicating that some jurors considered in a "he said, she said" context there is "no possibility of a guilty conclusion regardless of the testimony; in this case or any case." Aug. CT 29. A reviewing court cannot judge the credibility of any witness that testifies. The mere words on a page cannot convey all that the trial court and jurors experience and evaluate in the courtroom. The jury's verdict reveals that they were not "inflamed" by the inclusion of Adrian's testimony, but rather were able to segregate those counts on which they unanimously agreed evidence existed for a conviction beyond a reasonable doubt and those for which they could not. The totality of the record demonstrates that Adriana's testimony was merely one piece of the evidence as a whole considered.

Given the similarities of Adriana's testimony to that of the victims, the state's other significant and corroborating evidence, and the jury's own appreciation for the evidence required for each count, the Court does not find that Adriana's testimony had a "substantial and injurious effect" on the verdict warranting habeas relief. Accordingly, the Court finds that petitioner has failed to show that he is entitled to habeas relief based on the state courts' denial of his claim regarding the admission of Adriana's testimony.

**IV.    CONCLUSION**

The Court finds petitioner has not met his burden to show that he is in custody in violation of the Constitution or laws or treaties of the United States, and his petition is hereby **DENIED**. The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: July 30, 2019

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**